## L. H. EVERSOLE v. WABASH RAILROAD COMPANY, Appellant.

### Division One, April 8, 1913.

1. **INSTRUCTION: Covering Case: Imposed on Court.** The act of counsel in declining to ask an instruction setting forth the facts entitling plaintiff to recover, and thus forcing the court to give one of its own motion covering plaintiff's theory of his right to recover, is to be condemned.

2. **NEGLIGENCE: Imputed to Volunteer Rescuer.** An employee of one railroad, in order to recover for personal injuries from another, received by him in voluntarily trying to stop runaway cars of the other, must show that some other person was in actual and imminent peril and that he acted from humanity's sake to rescue such person from the peril. Imminent peril to mere property is not sufficient; nor is the mere fact that the volunteer saw persons on and about the track ahead of the runaway cars.

3. ————: ————: **Instruction: Not Supported by Evidence.** Where plaintiff, an employee of one railroad, voluntarily attempted to stop runaway cars of another railroad and was injured by their collision with an engine, and where the court by its instruction limited his right to act at all to the imminent peril of other persons, a verdict for plaintiff cannot stand if there was no evidence that any such person was in peril, for then there was no evidence upon which to base the instruction.

4. ————: ————: **Demurrer.** Where plaintiff's petition clearly bases his right to recover on the fact that the lives and limbs of persons were in imminent peril from defendant's runaway train, and that he, an employee of another railroad company, voluntarily got upon the footboard of the defendant's engine following the cars, in order to effect a coupling with the cars and to rescue such persons, a demurrer to his case should be sustained and a judgment in his favor simply reversed on appeal, if he produces no evidence that any person was in imminent peril and none showing a situation which led him to believe another was in peril.

Appeal from Jackson Circuit Court.—*Hon. Thomas J. Seehorn*, Judge.

REVERSED.

*J. L. Minnis* and *Sebree, Conrad & Wendorff* for appellant.

(1) The court committed error in overruling the defendant's demurrer to the evidence, and also committed error in refusing to grant the defendant's instruction in the nature of a demurrer to the evidence. Eckert v. Railroad, 43 N. Y. 502; Donahue v. Railroad, 83 Mo. 560; Morris v. Railroad, 148 N. Y. 182; Deville v. Railroad, 50 Cal. 383; Corbin v. Philadelphia, 7 A. M. Neg. Rep. 563; McManamee v. Railroad, 135 Mo. 440. (2) The plaintiff was a volunteer and the evidence does not warrant a recovery. (3) There was no proof of negligence of the engineer. (4) There was no negligence in using the engine. (5) The plaintiff was guilty of negligence which caused his injury. (6) The court committed error in giving, upon its own motion, instruction numbered one.

*Guthrie, Gamble & Street* for respondent.

(1) Plaintiff was not a volunteer. The emergency justified the engineer in accepting his assistance as an employee *pro tempore*. While assisting he was entitled to at least the protection of an employee. Railroad v. Ginley, 100 Tenn. 472; Martz v. Railroad, 77 Hun, 77; Sloan v. Railroad, 62 Iowa, 728; Fox v. Railroad, 86 Iowa, 368; Railroad v. Probst, 83 Ala. 518, 85 Ala. 203; Goff v. Railroad, 28 Ill. App. 529; Railroad v. Willis, 83 Ky. 57. (2) One who negligently causes a situation of danger to human life and limb is responsible for injuries received in a justifiable attempt by a third party to avert such danger. It is for the jury to say whether the circumstances

justified the attempt.  Steel Co. v. Marney, 48 Md. 482;
Whitworth v. Railroad, 112 La. 363; Gibney v. New
York, 137 N. Y. 1; Railroad v. Lynch, 69 Oh. St. 123;
Linnehan v. Sampson, 126 Mass. 506; Railroad v. Lan-
gendorf, 48 Oh. St. 316; Railroad v. Ridley, 114 Tenn.
727; Railroad v. Crosby, 74 Ga. 738; Railroad v. Lied-
erman, 187 Ill. 463; Corbin v. Philadelphia, 195 Pa.
461; Payton v. Railroad, 41 La. Ann. 861; Becker v.
Railroad, 110 Ky. 474; Railroad v. Orr, 121 Ala. 489;
Condiff v. Railroad, 45 Kan. 256; Walters v. Light
Co., 12 Colo. App. 150; Railroad v. Kotoski, 101 Ill.
App. 300; Donahoe v. Railroad, 83 Mo. 560; Koons v.
Railroad, 178 Mo. 608; Clark v. Shoe Co., 16 Mo. App.
463.    (3) It is immaterial whether danger actually
exists, or may be, or is, averted by others.  It is suffi-
cient if the appearances reasonably justify an appre-
hension of danger.  Authorities under point 2; Labatt
on Master & Servant, sec. 360; Railroad v. Roane, 33
Tex. Civ. App. 301; Railroad v. Lyons, 54 Neb. 633.
(4) The coupler was defective.  (5) The engineer neg-
ligently managed the engine.

GRAVES, J.—Action for personal injuries.  Ver-
dict and judgment for plaintiff in the sum of $10,000,
from which the defendant has appealed.  Plaintiff is
an experienced railroad man, but was not an employee
of the defendant.  The negligence complained of is
best stated in the following extract from the petition:
     "On or about the 20th day of August, 1906, and
at about the hour of 3:30 p. m., the defendant company,
through a crew of engine men and switchmen, was op-
erating a train consisting of an engine and about fif-
teen or twenty freight cars from the north, on to and
south through, across and beyond the tracks of said
Union Depot Company.  The engine was on the north
end of the train pushing the cars southwardly.  At
about the time said engine was entering upon the tracks
of said Union Depot Company the speed of said en-

gine was slackened for the purpose of slackening the speed of said train as same proceeded over said Union Depot Company's tracks.    Upon said engine being slackened, the momentum of said cars caused same to strain against the coupling device connecting said engine and the nearest of said cars thereto, and said strain caused said coupling device to part and separate, because said coupling device was at such time, and for a long time theretofore had been, through negligence of the defendant, in an unsafe, defective and improper condition, so that same was not reasonably sufficient for the purpose of holding such cars to such engine and under the control of such engine under ordinary course of switching and moving such cars by means of such engine, all of which was known to the defendant, or could have been known to the defendant by the exercise of ordinary care.    Upon said cars being so separated from said engine, going, as the same were at such time, at great speed and momentum and on the down grade, there ceased to be any substantial means of controlling and checking the speed of such train as same should pass over and along parts of the track of said Union Depot Company where such train at such speed and with such lack of control was likely to endanger human life and limb, unless through the means adopted by the plaintiff as hereinafter stated.    When said cars separated from said engine, said cars proceeded with increasing speed, and said engine with diminishing speed, so that the space between the same was widening.    Said engine was provided at the front end thereof with a foot-board for the purpose of enabling switchmen to ride thereon and if necessary operate said coupling device while said engine and cars to which same was to be coupled were in motion.    The plaintiff at such time was an experienced switchman in the employ of another railroad company.    As said engine and cars were moving and

separating as aforesaid, they were passing the plaintiff, and plaintiff observed said lack of control, and, recognizing the danger to human life and limb existing and the best available means of averting danger to human life and limb and as a most prudent and expedient thing to be done in the emergency, stepped toward said footboard on said engine and gave to said engineer a signal indicating to said engineer that the plaintiff, as a switchman, would ride upon said footboard and that such engineer should increase the speed of such engine so as to quickly overtake said cars, enable the plaintiff to readjust such coupling device and catch and hold said cars as quickly as possible, which signal said engineer understood and answered, rightfully accepting such tender of assistance by plaintiff, so that plaintiff stepped upon the footboard of said engine, prepared to re-connect such coupling device as soon as said engine with increased speed should overtake said cars, and said engineer did increase such speed, but not promptly and sufficiently and with ordinary care and prudence, but negligently and with unnecessary delay and decrease of speed, so that the said engine did not overtake said cars so as to enable plaintiff to re-connect said coupling device until about the time that said string of cars so drifting down and along said Union Depot tracks, struck and collided with another engine and train thereon, whereby said engine was brought into violent contact with the north end of said string of cars to which plaintiff was about to make such coupling, and said engine and coupling so broken, damaged and pressed together with said cars as to injure the plaintiff as hereafter stated.''

Answer was a general denial and plea of contributory negligence.

Defendant insists upon its demurrer to the testimony, and this requires a more detailed statement of the situation. On the day in question the defendant

was making a transfer of a train of cars from its yards to the yards of some other company. In doing so the cars were pushed rather then pulled by the engine, although the engine was and had to be coupled to the cars. To get these cars to their destination the defendant had to push these cars over a Burlington track, and from thence over a track known as track No. 9 running through the Union Station grounds or Union Depot yards at Kansas City. This track No. 9 is the track on the extreme south in these yards, and is usually used for the making of such freight transfers, although other tracks, 7 and 8, were sometimes so used. In passing along on the Burlington tracks this transfer train had to pass under the Fifth street bridge. The engine was on the north end of the transfer train of about fifteen cars. When the north car in the train reached the point of this bridge the engine became detached from the train and separated therefrom by a car-length or more. The cars were moving eight to ten miles per hour, and the track slightly down-grade. Three brakemen were on the cars, and the engineer signaled them to put on brakes. As the engine reached the bridge an employee or watchman in a signal tower near the bridge, which is called in the evidence the north signal tower, gave notice to the watchman at the signal tower in front of the baggage room at the Union Depot, and this watchman, seeing a Rock Island engine and its crew standing upon track No. 9, went down out of his tower and notified the engine crew to get off their engine because the transfer train was coming down their track detached from the engine.

As stated the plaintiff was an experienced railroad man. At the time he was a watchman for the C. B. & Q. Railroad and was near this bridge when the defendant's engine reached that point. Seeing the situation and hearing some "hollowing" near the depot, he got on the moving engine for the purpose of

coupling the engine to the train of cars running in front of it. Whilst in this position the south car of the train collided with the Burlington engine on track No. 9, and the engine upon which plaintiff was riding ran into and collided with the north car of the train, in which collision the plaintiff was seriously injured. Further details will be left to the opinion. This sufficiently outlines the case.

I. The court of its own motion gave the instruction which presented the case to the jury for the plaintiff. So far as the record shows the plaintiff requested but two instructions: (1) an instruction upon the measure of damages, and (2) one defining the term "ordinary care." The first above named the court modified and gave and the other was given without modification. The plaintiff's theory of his case must be left in the dark, so far as instructions are con-

Instruction:
On Theory
of Case.

cerned, because he asked none covering the case. This burden for some reason seems to have been cast upon the court. If counsel purposely cast this burden upon the court, plaintiff ought to be bound by the court's attempt to outline to the jury the theory of the case as presented by the petition. In other words, the idea possessed by some lawyers that an instruction on the measure of damages in a personal injury case is all that they should attempt to write for fear of getting error in the record is an idea which when put into practice should be promptly condemned. There should in all cases be at least one principal instruction outlining to the jury the theory under the petition upon which recovery is sought. The jury should not be left to gather the theory of recovery from the petition, aided solely by a formal instruction upon the measure of damages. Nor should counsel cast the burden upon a trial judge to draw such an instruction. The status

of the record would indicate that such had been done in this case, because the record before us shows that the plaintiff only requested the two formal instructions above mentioned, thus forcing the court to write the principal instruction, or submit the case upon the petition and the two formal instructions aforesaid. If such is a fact, it is a matter to be condemned. But the record may not disclose all that occurred, and it may be that the trial judge voluntarily drew the general instruction and plaintiff's counsel having seen it proffered none of their own. Upon the part of the plaintiff the case was submitted to the jury by an instruction given by the court upon its own motion, in this language:

"The jury are instructed that if you find and believe from the evidence that on or about the 28th day of August, 1906, an engine of the defendant connected with a string of freight cars, with such cars in front of the engine, was approaching the Union Depot in Kansas City, Missouri, and that as such engine and cars approached said station said engine and cars became separated at the coupling between the engine and the car next thereto and that said engine and cars became uncoupled (if they did) as a direct result of such coupling device being (if it was) in an unsafe defective and improper condition, so that same was not (if it was not) reasonably safe for the purpose of holding such cars to such engine and under the control of such engine in the course of the use of the same as same was being used, and that such unsafe, defective and improper condition (if existing) could have been known to the defendant, by the exercise of ordinary care, in time to have repaired the same, by the exercise of ordinary care, prior to the time plaintiff was injured (if he was), and that the defendant negligently failed to make such coupler reasonably safe and sufficient (if it was not) for the purpose of coupling and holding cars, and if you further believe and find from

the evidence that such disconnected condition of such cars and engine (if existing) was such as to create a condition of imminent and immediate danger to life and limb in reference to persons who you find were (if you do), or might reasonably be expected to be, upon railroad tracks over and across the grounds of said Union Depot where you find (if you do) such disconnected cars were going or might be reasonably expected to go; and if you further believe and find from the evidence that the plaintiff saw and observed the conditions existing (if they did exist) to a sufficient extent to justify a reasonably prudent man in believing (if a reasonably prudent man would have so believed) and that plaintiff did believe that there was imminent and immediate danger to human life and limb; and if you further find and believe from the evidence that the plaintiff, for the purpose of endeavoring to prevent immediately impending injury to human life and limb, stepped upon the footboard of such engine in pursuance of an understanding (if there was any) between himself and the engineer in charge of such engine that such engine should be speeded up and the plaintiff re-couple such coupling device for the purpose of controlling the movement of and stopping such cars by such engine, and that the means last aforesaid was a possible, practicable and reasonably prudent method of connecting with, and controlling the movement of, such cars; and if you further believe and find from the evidence that defendant's engineer in charge of such engine negligently failed (if he did) to properly increase and control (if he should have increased and controlled) the speed of such engine for the purpose of coming into contact with, and coupling with, such cars before the collision (if any) and avoiding injury to plaintiff (if you find from the evidence that it would have done so); and if you further find and believe that as a direct result of

all matters and things as aforesaid a collision occurred and the plaintiff was injured; and if you further find and believe from the evidence that the danger to the person acting as you find the plaintiff acted was not so great and glaring that a reasonably prudent person would have refrained from so doing under all the facts and circumstances detailed in evidence, and the plaintiff was in the exercise of such care as an ordinarily prudent man would exercise under like circumstances, then your verdict should be for the plaintiff.

"In the foregoing statement the court has recited and made reference to certain facts and conditions alleged by plaintiff to exist. These recitations are for the sole purpose of advising you as to facts each and all of which it is necessary for you to find to exist before the plaintiff is entitled to a verdict, and you must not assume from the form of any such statement or recitation that any fact referred to is to be taken as true until and unless you yourself find the same to be true from the evidence submitted to you."

We set out this instruction, because we can discuss it and the objections lodged against it along with defendant's demurrer to the evidence. Whether the instruction covers the case pleaded may become a question later. Suffice it to say now that if counsel declined to request an instruction covering their case and thus forced the court to give one of its own motion, the practice is to be condemned.

II.    By its demurrer to the testimony the defendant has challenged the sufficiency of the plaintiff's evidence to make a case for the jury. They therefore complain of the instruction given as being one not authorized by law under the facts of the case. Counsel urges that the evidence fails to disclose that any person was in imminent peril at the time plaintiff

<span style="float:left">Imputed<br>Negligence:<br>Voluntary<br>Rescuer.</span> boarded the moving engine, and fails to disclose that plaintiff thought that any person was in imminent peril at such time. This was a condition precedent to a recov-- ery under the instruction. Whatever theories, other than this, may be presented by the petition and this instruction, we discuss this point first, because if this be a material element in plaintiff's case, and if there be no evidence upon which to submit that question to the jury, then the instruction given is at least error. Whether such state of the case would demand that the demurrer to the evidence be sustained might require further developments.

It will be observed that the instruction limits the imminent danger to the imminent danger to person and does not include danger to property. This is the question upon which the jury had to pass and the query for us is, does the evidence authorize the submission of that question to the jury? Bearing upon this point the plaintiff testified in chief, thus:

"Q. As the north end of this train passed you, where was the engine with reference to the train? A. It was about a car-length from the head car.

"Q. That is, there was a car-length space between the car and the engine? A. Yes, sir.

"Q. Which direction was the engine headed? That is, the front end of the engine? A. It was headed towards the drag.

"Q. At about what speed were they going as they passed you? A. Well, about eight or ten miles an hour.

"The Court: What do you mean—the engine, or the cars?

"Mr. Guthrie: I asked him about the two of them—the plural.

"Q. Was there any difference between the two, at that time? A. No, sir.

"Q. How was the grade of the track there, on south from the Union Station? Is it up grade, level, or down grade? A. It is down grade—going to the south.

"Q. As the train passed by you, and you saw this rear brakeman,—the one nearest the engine,— was he making any effort to stop the train? A. No, sir—I didn't see any.

"Q. To what extent, in railroad practice, are the hand brakes used for braking or stopping a train of that character? A. Well, years ago they were altogether used for stopping trains; but in late years they depend entirely upon the engine and air brakes to stop them.

"Q. As this space between the cars and the engine came opposite you, was your attention attracted in any way down towards the Union Station—down towards the north end of the baggage room? A. Yes, sir.

"Q. How? A. I seen people running out on the depot platform, and hollowing and yelling and waving their hands.

"Q. What did you do at this time, Mr. Eversole? A. I jumped up from the footboard where I was sitting, and stepped out on the Wabash engine and gave a signal to the engineer to come ahead quick, we would catch these cars.

"Q. What did you step on, what part of the engine? A. The footboard.

"Q. Is that provided there for switchmen to ride on? A. Yes, sir.

"Q. When you gave this signal to come ahead quick—did he respond in any way? A. Yes, sir.

"Q. How? A. Well, he increased his speed for a short distance and then slackened up his speed and then started up ahead again.

"Q.  What happened at the time he started ahead the second time?  A.  Almost instantly the cars hit something at the other end."

Upon cross-examination much of the general statements above is more fully explained.  In the cross-examination he says:

"Q.  You say you were sitting under this Fifth street bridge at the time this Wabash train passed along?  A.  I wouldn't state that we was exactly under it, but we were very nearly under it.

"Q.  How much of the train had passed when your attention was called to it?  A. Practically all of the train.

"Q.  In fact you never paid any attention to it until you saw the engine was detached from the train?  A.  I didn't pay any particular attention until that time.

"Q. How many tracks run along there under that Fifth street bridge, where that engine was standing —where you were?  A.  I think there was four, at that time.

"Q.  And how many tracks were you at the time from the Wabash transfer?  A.  We were directly on the next track.

"Q.  Directly east of that?  A.  Yes, sir.

"Q.  Were you on the outside east track, or on one of the middle tracks?  A.  I was on the one next the middle tracks.

"Q.  It was on the track west of the one you were on?  A.  No, the Wabash was on the fartherest track west.

"Q.  And you were on the second track from the west?  A.  Yes, sir.

"Q.  Then, there were two tracks running along there that were east of you?  A.  Yes, sir.

"Q.  This train came along there, and you got on the footboard of the engine?  A.  Yes, sir.

"Q. Had the engine passed you with reference to this Fifth street bridge, when you stepped on that footboard? A. We were almost directly under it.

"Q. The north or the south end of it? A. Towards the south end.

"Q. What did you notice, the first thing, before you stepped on? A. Why, I noticed the engine being separated from the cars; and the hollowing and shouting, and people running out on the depot platform.

"Q. You heard the hollowing and shouting down there, did you? A. Yes, sir.

"Q. How many people did you hear shouting? A. I couldn't say. *Sometimes one man can make as much noise as fifteen if he has got the right kind of a voice on him.*

"Q. Was there more than one man shouting? A. *I couldn't say. There was more than that running out that way.*

"Q. Where? A. *Towards the Wabash train.*

"Q. Where were they, that you saw running? A. *It seems like they were running from the baggage room, at the east end of the depot.*

"Q. That is—the north end of the depot is where the baggage room is? A. Yes, sir.

"Q. That was four or five hundred feet from where you were, wasn't it? A. Kind of on an angle, yes, sir.

"Q. Where you saw those people running, was four or five hundred feet from where you were, wasn't it? A. Yes, sir.

"Q. *And they seemed to be running out of the baggage room* towards this Wabash train? A. *Yes,* sir.

"Q. How many did you see running? A. There were several. I didn't have time to count them. I thought there were a dozen.

"Q. You thought there were a dozen people running out? A. Yes, sir.

"Q. Who were they, baggagemen? A. I couldn't say.

"Q. You saw all that before the train reached you? A. Yes, sir.

"Q. Had the train reached them, before you saw them running out? A. I couldn't say.

"Q. How many cars were on this train? A. I should judge fifteen or eighteen?

"Q. How long is a car, Mr. Eversole? A. They average thirty-four to thirty-six feet long.

"Q. So that a train of cars consisting of fifteen cars, would cover over five hundred feet, wouldn't it? A. Well, about that, I should judge.

"Q. *You saw these people running out from the baggage room* towards the train? A. *Yes, sir.*

"Q. Had the end of the train passed them when you saw them? A. I couldn't say as to that, because I was on the east side of the train, and there was a curve down just a short ways from where we were —it curves around and goes down by the depot.

"Q. It goes down in front of the depot, doesn't it? A. Yes, sir.

"Q. These tracks don't run through the depot; but in front of it? A. Yes, sir. . . .

"Q. Were these people running, or walking, there at the depot? A. Why, some of them were running; and some of them were walking.

"Q. Where were they going? A. I couldn't say where they were going.

"Q. You say you saw a dozen men run out there, do you? A. I said, that it seemed to me like there was a dozen men.

"Q. Towards that train? A. Yes, sir.

"Q. You couldn't see the end of the train at the time could you? A. Not the south end of it.

Eversole v. Railroad.

"Q. You couldn't see where it was? A. No, sir.

"Q. From where you were, under the bridge, could you see that baggage room door? A. Well, I don't know as I could see the baggage room door; but I could see right directly in front of the baggage room door.

"Q. Could you see out in front of that baggage room door, from under the fifth street bridge there? A. Yes, sir.

"Q. What company were you working for? A. The Burlington.

"Q. The Burlington railroad? A. Yes, sir."

It will be noticed that this instruction submits two alleged negligent acts of the defendant (1) a defective coupler and (2) a failure of the engineer to speed up the engine so as to overtake the runaway cars. One is a negligent act occurring before plaintiff volunteered to get upon defendant's engine. We use the term "volunteered" advisedly, because the evidence discloses no invitation from defendant or its agents and servants to the plaintiff to board such engine and undertake to do the work which he says he boarded the engine to do. By no sign or word was he invited to board that engine. His act of getting thereon was one of his own volition. In other words, in that act he was a "volunteer" pure and simple. It is also true of this instruction that it submits to the jury the question, whether or not, at the time the plaintiff boarded this engine, there was "imminent and immediate danger in reference to persons whom you found were (if you do) or might reasonably be expected to be, upon railroad tracks over and across the grounds of said Union Depot," etc. The instruction goes no further in predicating a reason justifying the voluntary act of the plaintiff. In other words, it limits his right to act to the imminent peril of persons, and does not extend it to imminent destruction of

property. The latter is urged in the brief of respond-
ent, but it is clearly not within the instruction supra.
Our view of the situation is, that inasmuch as the
right of the plaintiff to act at all in the premises is
limited to the imminent perilous' fortunes of per-
sons, then if the evidence fails to disclose such a situa-
tion, the instruction is error, because submitting a
theory not sustained by the evidence. To this end we
set out at length the evidence. To our mind this evi-
dence totally fails to disclose that any person was
in imminent peril, or that the plaintiff reasonably had
the right so to assume or believe. · The hour was three-
thirty in the afternoon, when passenger trains were
not arriving. The track upon which the cars were go-
ing was one not used for passenger service—so that
the things present were not such as to indicate that
such persons were or would be in peril. But further,
one who attempts to assert the original negligence of
a defendant toward one who is in peril, must show that
there was some one in peril and that he acted from
humanity's sake to rescue such person from peril. It
is only under such circumstances that the usual rash
acts of the rescuer are excusable; and he is permitted
to impute the negligence committed as against the
person in peril to himself. Under the evidence in
this case plaintiff saw no person in peril. The em-
ployees are required by law to look out for their own
protection and the presumption is that they were do-
ing so. The flagman did run out and warn the crew
upon the train standing upon track 9 that the loose
cars were coming down. Others may have joined him
in giving the warning, but this fact will not reduce the
case to that of a person in imminent peril, so as to
permit the prior negligence of the defendant to be
taken advantage of by a mere volunteer.

The rule is well stated by HENRY, J., in Donahoe
v. Railroad, 83 Mo. l. c. 563, thus:

"It is to be observed that it is only when the railroad company, by its own negligence, created the danger, or through its own negligence is about to strike a person in danger, that a third person can voluntarily expose himself to peril in an effort to rescue such person and recover for an injury he may sustain in that attempt. For instance, if a man is lying on the track of a railroad intoxicated or asleep, but in such a position that he could not be seen by the men managing an approaching train and they had no warning of his situation, and another seeing his danger should go upon the track to save his life and be injured by the train, he could not recover, unless the train men were guilty of negligence, with respect to the rescuer, occurring after the beginning of his attempt. 'If the railroad company is not chargeable with negligence with respect to the person in danger, the case of the person who attempted to rescue him and was injured must be determined with reference to the negligence of the company in its conduct toward him, and his in making the attempt. In other words, the negligence of the company, as to the person in danger, is imputed to the company with respect to him who attempts the rescue, and if not guilty of negligence as to such person, then it is only liable for negligence occurring with regard to the rescuer, after his efforts to rescue the person in danger commenced."

But on the other hand we have held that the rescue of property will not authorize rash acts upon the part of a rescuer. [McManamee v. Railroad, 135 Mo. 440.] In that case the following instructions met with our approval:

"While it may have been the duty of defendant's servant to make all reasonable efforts to stop the train and avoid the collision, yet the like duty devolved upon the deceased, and if, after he saw the train coming, or might, by looking and listening, have seen it coming, he could have gotten out of its way, or kept

out of its way, but did not, then the plaintiff cannot recover; *and even should the jury believe that the deceased's horse and wagon was exposed to a collision with defendant's train, this would not excuse or justify him precipitating himself in front of the train, and if you find he did so in order to save his said horse and buggy, then your verdict must be for the defendant."*

The italics are ours. In other words we have never extended the doctrine of "imminent peril" to mere property, but have followed the law of humanity which prompts one person to save the life or limb of another.

In the Donahoe case, supra, this court cited with special approval the Eckert case in 43 N. Y. 502. The second paragraph of the syllabus in that case reads:

"A person voluntarily placing himself, for the protection of property merely, in a position of danger, is negligent, so as to preclude his recovery from an injury so received. It is otherwise, however, when such an exposure is for the purpose of saving human life, and it is for the jury to say, in such cases, whether the conduct of the party injured is to be deemed rash and reckless."

In the body of the opinion, page 506, it is said:

"The law has so high a regard for human life that it will not impute negligence to an effort to preserve it, unless made under such circumstances as to constitute rashness in the judgment of prudent persons. For a person engaged in his ordinary affairs, or in the mere protection of property, knowingly and voluntarily to place himself in a position where he is liable to receive a serious injury, is negligence, which will preclude a recovery for an injury so received; but when the exposure is for the purpose of saving life, it is not wrongful, and therefore not negligent unless such as to be regarded either rash or reckless."

This we take to be the reasonable rule. It is at least the approved doctrine of this court. So that we

can see why the trial judge in giving his instructions limited the question of imminent peril to persons rather then to property.

But in this case, under the evidence, we do not think that question should have been submitted. The plaintiff's evidence failed to make a case upon that point. Some one must be actually in peril before the rescuer is authorized to act. At the broadest, the situation must be such as to clearly convince the rescuer that human life or limb is in peril. The evidence in this case does not measure up to the standard. There was no such evidence as would justify the submission of that question to the jury, and in this regard the instruction given was error. Not only so but to this extent at least the defendant's demurrer was well taken.

III. It is apparent, as in the preceding paragraph indicated, that there was no situation which would justify the action of the plaintiff upon the theory that human life or limb was in imminent peril. It requires more than mere suspicion that accident might follow to justify the invocation of the doctrine of "imminent peril."

No Imminent Peril: Dismissal.

For this reason we held as above indicated that the instructions given beyond the substantial evidence of the case should have never been given. But does it follow from this that the demurrer to the evidence should have been sustained? In other words, does it follow that no case was made under the proof and pleadings? If a case is submitted to a jury by instruction upon a theory not sustained by the evidence, we are required to reverse the judgment based upon the erroneous action, but it does not follow that we must say that there is no theory upon which the plaintiff might recover under his pleadings and proof. So in this case we cannot allow the present verdict to stand, because the theory predicated in the instruction

is not sustained by the proof, but it does not follow that we must say that there was or was not a case made. Whether there was or not a case made upon any theory of the petition, depends upon a consideration of this pleading, as well as the evidence introduced. As stated above there are two kinds of negligences charged in the petition; (1) negligence of the defendant prior to the time plaintiff boarded the engine, and (2) alleged negligence of the engineer after he boarded the engine. But whilst this is true, does not the plaintiff's petition cluster all these things around the one central thought, i. e., that his action was prompted by his desire to rescue human life and limb, and not otherwise. We think so. For this reason in the statement we have purposely quoted at length from the petition. It is clear that the plaintiff was never invited by defendant to board this engine. It is clear that three brakemen were on the runaway cars. Plaintiff by his petition attempts to justify his boarding the engine upon the imminent peril doctrine, and in our judgment his petition as a whole must be construed to be one invoking that doctrine. If it be so construed, and if as held in our paragraph two, the evidence fails to support such a doctrine, then there was a failure to make any case under the pleadings, as well as under the proof. In such event the demurrer to the evidence should have been sustained, and a verdict for the defendant directed. We conclude therefore that the petition of the plaintiff is one invoking the "imminent peril" doctrine in its purity and simplicity; that under the petition so construed (as it was construed by the trial court) there was a failure of proof, and this judgment should be simply reversed. *Woodson, P. J.,* concurs; *Lamm, J.,* concurs in result; *Bond, J.,* not having heard the oral arguments, does not sit.