**Merrie Dean ELLMAKER, Plaintiff-Respondent,**

**v.**

**The GOODYEAR TIRE & RUBBER COMPANY, a corporation, and William T. Buckner, Defendants-Appellants.**

**No. 23824.**

Kansas City Court of Appeals.

Missouri.

Oct. 7, 1963.

---

John M. Kilroy, John R. Caslavka, Kansas City, Ike Skelton, Lexington, for appellant.

Robert S. McKenzie, McKenzie, Williams, Merrick, Beamer & Stubbs, Kansas City, William Aull, Jr., Aull & Aull, Lexington, for respondent.

CROSS, Judge.

Plaintiff Merrie Dean Ellmaker maintains this suit to recover damages for the wrongful death of her deceased husband, James Robert Ellmaker. Defendants Goodyear Tire & Rubber Company and William T. Buckner have appealed from a judgment adverse to them entered on a jury verdict awarding plaintiff damages in the sum of $13,500.00.

When this suit was originally filed, Ernest R. Kohlstaedt was named as a third defendant, but died during pendency of the action and Ella Kohlstaedt, administratrix of his estate, was substituted as party defendant in his stead. The jury in returning its verdict found the issues in favor of the substituted defendant and against plaintiff. No appeal has been taken from the judgment entered on that phase of the verdict.

The decedent came to his death by a tragic incident occurring on October 27, 1960, in Lexington, Missouri. The essential facts and circumstances leading to the casualty are here set out.

At the time of and prior to his death, decedent operated a Sinclair service station in Lexington, Missouri, where he resided. Defendant Goodyear Tire & Rubber Company, a foreign corporation, owned and operated the "Goodyear Service Store" in Lexington, an establishment which sold tires, batteries and other automotive equipment, at both wholesale and retail, and rendered service in connection therewith. Defendant Buckner was an employee of Goodyear, and managed its Lexington Store. Buckner also resided in Lexington.

The Goodyear store is located and fronts south on Main Street in Lexington. Main Street runs east and west. In the extreme rear of the store, there is a basement room which is used as a service garage or tire changing shop and for storing tires. This service area opens to the north and faces upon a public alley running east and west. The vehicular entrance to the service shop is a door facing north reached by a rather steep driveway from the alley. The shop is 20 feet long and wide enough to accommodate one automobile and the storage of some tires in racks along the side walls. Patrons who come to this shop for service enter it from the alley by way of the driveway.

Decedent was a wholesale customer of Goodyear and regularly purchased tires at Goodyear's store for resale at his Sinclair service station. On the morning of his death decedent went to the above described service area of the Goodyear store for the purpose of buying some tires. He found that Buckner was engaged in servicing the automobile of another customer, the above referred to Ernest R. Kohlstaedt, who had previously arrived to purchase some tires and have them installed. Decedent waited in the service area for Buckner to finish that particular job. We digress here to narrate the circumstances of Kohlstaedt's arrival and the presence of his automobile in the shop inasmuch as that vehicle was the instrumentality of plaintiff's demise.

At some time around ten o'clock on the morning of October 27, 1960, Kohlstaedt drove his 1960 Chevrolet automobile along the alley in the rear of the Goodyear store, turned into the driveway from the alley and drove (forward) into the service shop "right in the basement there". Buckner waited upon him, sold him two tires for the rear wheels, and then directed him to reverse

the position of the car by backing it into the alley, turning, and then backing it into the shop so that the rear wheels would be positioned at the tire jack. Buckner jacked up the car, removed the rear wheels, mounted the new tires, replaced the wheels and removed the jack. He next tested the car's battery, found it to be defective, and installed a new one at Kohlstaedt's direction. Then, at Buckner's request, Kohlstaedt got in the car and started up the motor in order to see if the new battery worked properly. After stopping the motor Kohlstaedt went upstairs to pay his bill, leaving his automobile in the service area.

Buckner then undertook to fill decedent's order for new tires. Both men proceeded to a tire storage room which was immediately adjacent to the rear or south end of the service area but located on a higher level. Access from the service area to the tire storage room was by a flight of three stair steps. Decedent and Buckner picked out the new tires desired and set them aside. Then the two men went back down the stairs to the service area to look at some "recaps" which were kept on both sides of the walls "down where the car was parked". Being unable to find the particular "recap" decedent was looking for, the two men, who were then standing on the right hand side of the car next to the east wall, started to go back up the stairs to get the new tires from the storage room and make out the bill on them. The automobile was still in the same position it was in when Buckner installed the tires on it, and was entirely in the service area. The rear end of it was several feet from the steps.

According to Buckner's testimony, he was in the lead as the two men walked to the rear of the car and toward the steps. The car was not moving as he passed its right rear corner. When he reached the first or second step leading to the tire storage room he heard decedent say something to the effect that the car was moving. Buckner turned around, saw the car moving slowly and saw decedent holding onto the left side of the rear bumper trying to hold it back.

Buckner immediately stepped down and took hold of the right side of the bumper but the car continued to move forward, out of the building, down the driveway and toward the alley. At some point which is not clear from the evidence, but which appears to have been someplace between the general vicinity of the door and halfway down the driveway, decedent let go of the bumper and ran around to the left side of the car. When the car was about "halfway down the decline", it was going so fast Buckner had had to let go of the bumper to keep from being "dragged" because he couldn't "keep up with it". He stumbled a few steps and by the time he straightened up the car had run into and across the alley and hit a utility pole on the north edge of it. He was unable to state exactly where decedent was at that time except that "he had both hands on the steering wheel".

Apparently the only witness who actually saw the automobile strike the pole was John L. Painter, who was standing in the door of a lumber yard which faces the alley. The witness's attention was attracted either by Buckner's yelling or by the noise of the car, and he looked up in time to see the left door of the car hit the utility pole. Decedent was crushed between the door and some adjacent part of the automobile. Immediately after the car stopped, he was found lying in the front seat unconscious, and was dead upon arrival at the hospital. The cause of his death was stated as suffocation resulting from a ruptured lung.

The floor of the service area slopes $4\frac{1}{4}$ inches in its total length of 20 feet from the rear at the steps to the door opening onto the driveway. The driveway from the door opening to the south side of the alley has a length of 41 feet and drops $6\frac{1}{2}$ feet in that distance. The car traveled a total distance of approximately 60 feet to collide with the utility pole.

Buckner admitted that Kohlstaedt had backed the car in the service area as he (Buckner) directed; that at no time did he ever tell Kohlstaedt to set the brakes or

put the car in gear; that no chock or other device was used to prevent the car from rolling; and, that when he was installing the tires and battery on the car, he was "in charge of where the car would be and how it would be handled". Kohlstaedt, when asked (in a deposition read in evidence) whether the car was in gear when he started the motor after the new battery was installed, made this answer: "It surely wasn't in gear, otherwise it wouldn't have rolled—it wouldn't have got there". Examination of the automobile after the crash disclosed that the emergency brake was not "on" and the gear lever was in "neutral".

The case was submitted on behalf of plaintiff by Instruction P 1 permitting recovery under the humanitarian doctrine, and by Instruction No. P 2 which hypothesizes primary negligence on the part of defendants in jointly causing or permitting the Kohlstaedt automobile to roll forward from a stationary position in the service area into collision with the utility pole and to thereby inflict decedent with fatal injuries.

No question is raised by the appealing defendants as to the sufficiency of evidence to establish negligence on their part. Complaining of other matters, they contend that the trial court should have directed a verdict in their favor because (1) plaintiff did not appropriate the cause of action for her husband's death within six months, (2) decedent was guilty of contributory negligence as a matter of law in attempting to stop the rolling automobile, and (3) there was insufficient evidence to submit the case on the humanitarian doctrine.

Some additional facts pertinent to the history of this case are necessary for discussion of defendant's contention that plaintiff failed to appropriate her cause of action within six months after her husband's death, and are here set out. The present suit is the second one instituted by plaintiff on the cause of action for her husband's death. Her first action was filed in the Circuit Court of Jackson County, Missouri, on April 11, 1961, and within six months from the death of her decedent. Although defendant Goodyear Tire & Rubber Company, as a foreign corporation authorized to do business in Missouri, maintained its designated service agent and registered agent in St. Louis, Missouri, the summons issued for the corporation was served on it in Jackson County, Missouri, where it maintained a business office. Summonses were duly issued and served on defendants Buckner and Kohlstaedt in Lafayette County, Missouri, the county of their residence. All three defendants, appearing specially, filed motions to quash the returns of summons and to dismiss plaintiff's petition, on the grounds that summons upon Goodyear in Jackson County was unauthorized because its registered agent did not reside in Jackson County, but instead was a citizen and resident of St. Louis, Missouri, and that, therefore, the court acquired no jurisdiction over the person of defendant corporation or either of the individual defendants, both of whom resided in Lafayette County, Missouri. The circuit court sustained defendants' motions and dismissed the suit on the ground that its venue was improper. Thereafter, plaintiff unsuccessfully sought issuance of a writ of mandamus by the Supreme Court to compel the Circuit Court of Jackson County to accept jurisdiction and try the case.

The present action was filed in Lafayette County on September 27, 1961, a date which is more than six months but less than one year after the death of plaintiff's husband. Obviously, the suit was filed within one year after dismissal of the Jackson County suit. The petition as filed was in two counts. In the first count plaintiff asserted her cause of action as the surviving widow, alleging she had appropriated the action by filing the action in Jackson County within six months from the date of her husband's death, and that she "refiles" her cause of action within one year after the dismissal of that suit. In the second count the two minor children of decedent were named as alternative plaintiffs and it was alternatively alleged that, in the event it should be held

that their mother had not appropriated the cause of action, they, the children, were so doing by filing the suit more than six months after, but within one year from the date of their father's death. Defendants filed motions to dismiss *both* counts of the petition, in which they attacked the capacity both of the mother and of the children to bring the action. The trial court sustained the motions to dismiss count two and overruled motions to dismiss count one. The case went to trial and judgment on count one as hereinabove described.

Plaintiff's right, as a widow, to sue for the wrongful death of her husband is conferred by Section 537.080 V.A.M.S. and is limited to the period of six months after the date of such death by the effect of subdivision (2) of the cited statute which provides, "[i]f * * * she fails to sue within six months after such death, then (damages may be sued for and recovered) by the minor child or children of the deceased * * *". And, if it be the case that plaintiff as such widow had "commenced" such action within six months after the date of her husband's death, by filing the suit in Jackson County, and thereafter suffered a nonsuit, it was her legal right to "commence a new action from time to time within one year after such nonsuit suffered". Section 537.100 V.A.M.S.

■ Consequently, the question raised by defendants' first assignment is whether the prior suit filed by plaintiff in Jackson County—within the time authorized by law, but in the wrong forum—shall be deemed to be the "commencement" of an action for her husband's death within the meaning and purview of the applicable statutes, such as to validate the instant suit.

The general rule pertaining to the present question is stated in 34 Am.Jur., Sec. 284, p. 230, as follows: "Where the statute provides in substance that if an action is begun in due time and the judgment therein is reversed or judgment goes against the plaintiff on any ground not affecting the merits, a new action may be begun within a stated time, it is held with substantial unanimity that the running of the statute of limitations is interrupted by the bringing of a suit which is dismissed by the trial court or on appeal because instituted in a court having no jurisdiction. This rule is particularly applicable where the choice of a wrong forum is ground for abatement only, and not a jurisdictional defect". To similar effect is the statement contained in 54 C.J.S. Limitations of Actions § 270, p. 303, that "the suit will be considered filed as where, although it is brought in a county where neither plaintiff nor defendant resides, it is filed in good faith, under an honest mistake, and without negligence or carelessness".[1]

Missouri courts uniformly follow the foregoing rule quoted from C.J.S. The following statement from Krueger v. Walters, 238 Mo.App. 340, 179 S.W.2d 615, also a case where a widow timely filed a suit in the wrong court for the wrongful death of her husband, essentially summarizes the law prevailing in this state as it affects the issue before us:

"The question to be determined is whether it can be said that plaintiff brought a suit, within the meaning of the statutes, when she filed her suit in the wrong county. The authorities in this State hold, in construing statutes of limitations, that when plaintiff knows that neither he nor the defendant are residents of the county where the suit is filed, such a proceeding is merely the filing of a pretended suit and it cannot be considered that any suit at all has been filed, the court lacking jurisdiction. Conrad v. McCall, 205 Mo.App. 640, 226 S.W. 265; Mertens v. McMahon, Mo.App., 115 S.W.2d 180; See also Metzger v. Metzger, Mo.App., 153 S.W. 2d 118; Wente v. Shaver, 350 Mo. 1143, 169 S.W.2d 947, 145 A.L.R. 1176. However, in the Wente case it was held that

---

1. Citing Krueger v. Walters, 238 Mo.App. 340, 179 S.W.2d 615.

if the former suit is filed in good faith, that is to say, if an innocent mistake was made and there was no negligence or carelessness, the suit will be considered as having been filed, although filed in the wrong court. So, the question in this case resolves itself as to whether an innocent mistake was made in the filing of the former suit in the wrong court and that plaintiff was free from negligence in so filing it".

For an authoritative discussion of the present subject see Wente v. Shaver, 350 Mo. 1143, 169 S.W.2d 947, 145 A.L.R. 1176, a case cited and relied upon in Krueger v. Walters, supra. Also see the later case, Tice v. Milner, Mo.Sup., 308 S.W.2d 697. We have examined the cases cited by defendant and find nothing therein contradictory of the rules we have noted above.

█ Thus, the question of plaintiff's right to maintain this action under the tolling statute turns upon whether her former suit was filed in good faith, by innocent mistake and without negligence—considerations to be determined under all the surrounding facts and circumstances of this particular case. No cases have been cited, either by plaintiff or defendants, which turn on facts similar to those found in the instant case.

Defendants charge that the filing of plaintiff's prior action in the wrong court was due to negligence on her part. Therefore, they say, she must be denied the benefit of the tolling statute. Defendants argue essentially as follows: that when the Jackson County suit was filed plaintiff's counsel admittedly knew that plaintiff, defendant Buckner and defendant Kohlstaedt were residents of Lafayette County, and that defendant Goodyear Tire & Rubber Company was a foreign corporation, authorized to do business in Missouri; that plaintiff's counsel, despite their knowledge that Goodyear was a foreign corporation, made no investigation to determine the location of its registered office or agent and were content to examine the Kansas City telephone directory to see if the corporation had a business office in Jackson County; that under the provisions of Section 508.010, V.A.M.S. the suit should have been filed either in the county where plaintiff resided and one of the defendants could be found, or in a county in which one of the defendants resided; and, that the residence of a foreign corporation such as Goodyear is the county in which its registered office and agent are located. Therefore, say defendants, the mistake of plaintiff's counsel in filing the suit in Jackson County was the result of their negligence in failing to make adequate investigation which would have revealed that Goodyear's legal residence, for venue purposes, was in St. Louis.

Plaintiff submits that defendants' charge of negligence against her is not well founded "because it is based on the assumption that there was only one possible county of residence of the Goodyear Company with reference to the venue statute and that was the county of its registered agent. The law was far from settled in that regard, however, at the time plaintiff filed her suit in Jackson County". It is plaintiff's insistence that the institution of her action in Jackson County was not due to any lack of factual knowledge respecting the residence of Goodyear's registered office and agent, but that it resulted, instead, through a mistaken but justifiable view of the law, excusable under the circumstances.

It is true, as plaintiff suggests, that there has not been unanimity of judicial opinion in the interpretation of venue statutes applicable in suits wherein a foreign corporation is sued along with other defendants. Courts have continued to be divided as well as vexed by that problem.

At the time plaintiff's cause of action arose, the majority opinion in State ex rel. Whiteman v. James, 364 Mo. 589, 265 S.W. 2d 298, rendered by the Supreme Court en banc in 1954, *apparently* had settled the law by holding that for purposes of venue the legal residence of a foreign corporation is fixed by the location of its registered office

and registered agent. There were two defendants in the case—the foreign corporation which maintained its legal residence in St. Louis, and an individual defendant who lived in Andrew County. The court specifically ruled that the suit could be brought *either* in the City of St. Louis where the corporate defendant resided *or* in Andrew County, the residence of the individual defendant, but *not* in Jackson County, where the corporate defendant maintained an office and transacted business. The foregoing views were not supported by the entire court. A strong dissenting opinion was written and filed expressing the opinion of two dissenting judges to the effect that foreign corporations should be considered as having other residences, for venue purposes, than the county where their registered offices and agents are located, namely, "in any county where such corporations shall have or usually keep an office or agent for the transaction of their usual and customary business".

However, on December 12, 1960, less than two months after the death of plaintiff's husband and prior to the filing of her petition in Jackson County, the question of venue, which apparently had been settled by State ex rel. Whiteman v. James, supra, was revived as a subject of judicial controversy by the effect of another Supreme Court en banc decision—State ex rel. Stamm v. Mayfield, Mo.Sup., 340 S.W.2d 631. The adopted opinion, which received the full concurrence of a majority of the court, expressed disapproval of the majority opinion in State ex rel. Whiteman v. James, supra, insofar as its effect was to hold that for venue purposes the residence of a foreign corporation was limited to the county where its registered office is maintained. The expressed disapproval of the Whiteman case, however, was not responsive to any live issue presented in the case, and, consequently, did not have the effect of an authoritative ruling. A separate limited concurring opinion was filed by the author of the majority opinion in State ex rel. Whiteman v. James, supra, in

which he states, "As the author of the Whiteman opinion, I would reexamine that case when the question of its correctness has been challenged and is a live issue, so that it may be considered upon adequate briefs."

In our foregoing brief references to the Whiteman and Stamm cases, we have not undertaken to reflect the sequences of reasoning or the bases of legal authority underlying the opinions rendered therein. It has been our purpose only to demonstrate that when plaintiff's counsel were confronted with the necessity of deciding where plaintiff's case might or should be filed, there was substantial reason and reasonable cause for them to believe that the Supreme Court had held or would ultimately hold that a foreign corporation could be sued along with other defendants in a county in which it maintained an office or transacted business, and that, perforce, plaintiff could properly maintain her suit in Jackson County. The opinion in the Stamm case, the latest expression on the subject, might so indicate. We believe that lawyers and their client should not be declared negligent under these circumstances, in following a course that had the apparent approval of judicial opinion, if not authoritative decision.

As a sequel to the Whiteman and Stamm cases, a third case should be noted—State ex rel. Bowden v. Jensen, Mo.Sup., 359 S.W.2d 343. The opinion in that case, dated August 6, 1962, appears to have settled the foreign corporation venue question—at least by majority vote of the Supreme Court —in that it approves the majority opinion in the Whiteman case. Two judges still dissent. The author of the Stamm opinion filed a dissenting opinion in which he still disapproves Whiteman and would rule that foreign corporations can be sued with other defendants in counties where they do business. He is joined in his dissent by the author of the dissenting opinion in Whiteman. The ruling is of no consequence, however, as having any bearing on the point at hand. We are not presently concerned with the state of the law as it existed *after*

plaintiff's suit was filed in Jackson County. Our concern is whether the apparent state of the law *prior and at that time* was such as to reasonably justify plaintiff and her counsel in their choice of a forum.

For all the reasons set out above we are convinced that defendants' first point has no merit. The facts and circumstances before us do not convict plaintiff of negligence in filing her suit in Jackson County. We rule that in so doing she appropriated her cause of action.

In their next point defendants submit that the trial court erred in refusing their joint and separate motions for a directed verdict because plaintiff failed to make a submissible case on the issue of primary negligence. In so contending defendants admit that actionable negligence on their part has been established by the evidence, but insist that plaintiff's decedent was guilty of contributory negligence as a matter of law because he voluntarily left a place of safety and placed himself in a position of peril *in an effort to save property*—that is, to prevent damage to the automobile. Defendants concede that the "rescue doctrine * * * authorizes recovery if the plaintiff is attempting to save life and limb in imminent peril at the time of his reckless acts but has never been extended to the rescue of property", but they argue there is no evidence in the case to invoke the doctrine because "it is undisputed that no person was in imminent danger of life or limb at the time of the occurrence".

 We recognize that Missouri courts follow the general rule that a person is not excused from the consequences of contributory negligence in voluntarily exposing himself to known peril for the purpose of saving property. We do not, however, agree that it is conclusively shown by the evidence that the purpose of decedent's effort to stop the car was to save it from damage. Although the evidence does not disclose the presence of any persons immediately present in the path of or near the automobile as it rolled into the alley, there are abundant facts and circumstances shown from which the jury could reasonably believe that decedent's efforts were directed to the humane purpose of saving other persons from imminent danger of personal injury or death.

Defendants insist that decedent was not justified in exposing himself to danger because no person is shown to have been in actual danger of being struck by the rolling vehicle. As authority for so contending defendants rely upon Eversole v. Wabash R. Co., 249 Mo. 523, 155 S.W. 419, from which they quote selected, isolated statements which do not reflect the entire sense of the opinion. Our reading of the entire opinion, as a whole, discloses that the Supreme Court did not limit the rescue doctrine so narrowly.

In 19 A.L.R. 11, Anno.—Rescuer—Death or Injury, the meaning and effect of the Eversole opinion is stated to be as follows:

> "Before the rescuer is authorized to act on the ground that another is in imminent peril, there must be more than a mere suspicion that accident to some person may follow if he does not act; there must be someone actually in peril, or, *at least, the situation must be such as to induce a reasonable belief that some person is in imminent peril;* and one who attempts to assert the original negligence of a defendant toward another person who is in peril must show that there was someone in peril, *or that he reasonably had the right so to assume or believe.* Eversole v. Wabash R. Co. (1913), 249 Mo. 523, 155 S.W. 419, supra". (Emphasis supplied.)

We accept the foregoing A.L.R. statement as an accurate digest of the meaning intended by the Supreme Court in the Eversole opinion, and believe that it correctly reflects the authoritative rulings of that court on the question involved.

 We therefore conclude it is not the law in Missouri that a particular individual must be in actual danger before another

person may justifiably act even at his own risk, to avert a casualty. It is sufficient if the situation presented is such as to induce "a reasonable belief that some person is in imminent peril". The intending rescuer may act, with danger to himself if he reasonably had the right to "assume or believe" that the life or limb of another person is in peril. "It is sufficient * * * that someone is in danger, although, at the moment the effort to rescue is made, the danger is not imminent to a definite person, *and, even though no danger is actually imminent, the rule is applicable to one who acts on appearances, if his conduct is that of* an ordinarily prudent man under the circumstances." 65 C.J.S. Negligence § 124, p. 738. (Emphasis supplied.)

In Burnett v. Conner, 299 Mass. 604, 13 N.E.2d 417, a decedent was killed in an attempt to stop a moving automobile under circumstances very similar to those in this case. The defendant car owner had parked the vehicle in a steep driveway without effectively setting the emergency brake and as a consequence it rolled backward down the steep grade toward the street. Decedent, who had been washing the car, first tried, without effect, to hold it back with his hands. As the car continued to roll he opened the left hand door and reached inside, and ran along with the car as it gathered speed. Finally the car rolled over a retaining wall, into the street, and landed on top of decedent with fatal result. The Supreme Court of Massachusetts held that decedent was not contributorily negligent as a matter of law, pointing out that the situation was one which might result in danger to the lives of passersby on the highway. The court said, "The deceased could be found to have acted instinctively in recognition of the possibility that persons passing by on foot or in vehicles would be put in peril of their lives if the defendant's automobile continued on its course. * * * It was for the jury to say whether in all the circumstances the action of the deceased 'was so rash and reckless as to preclude a finding that he was in the exercise of due care and was justified' in his course of conduct." Also see American Express Co. v. Terry, 126 Md. 254, 94 A. 1026.

In Hollaran v. City of New York, 168 App.Div. 469, 153 N.Y.S. 447, the plaintiff's decedent was killed while attempting to stop unattended runaway horses. The court observed that "The horses were running in a measurably busy street, and there was ample opportunity for harm to come to some one, although the danger was not at the moment imminent to a definite person." Holding that decedent was not guilty of contributory negligence as a matter of law the court stated:

"[i]n the case at bar, horses with a street sweeper were dashing ungoverned through the street, and the jury was justified in inferring that, if they continued unchecked, harm would come to some one. Indeed, that apprehension would come to the mind of any rational and well-disposed person. The question, then, is whether a man strong in courage and capable physically should be content to let the probably destructive agency go its way or attempt to stop it. It is not necessary to let admiration for the deed influence our judgment of its rational nature. In the Eckert [Eckert v. Long Island R. R. Co., 43 N.Y. 502] and Muhs [Muhs v. Fire Ins. Salvage Corps., 89 App. Div. 389, 85 N.Y.S. 911] Cases it is said that the person attempting the service was under a duty to rescue the person in danger. Such sense of duty is based upon feelings of the highest value. Whether it was or was not culpable to obey the prompting to that duty depends upon the conditions presented. It is a choice between strong and brave men keeping themselves in assured safety and letting the horses make their hurtling way unchecked, or using efforts as prudently as the occasion permits to avert it. In the present instance, it was a fair question for the jury whether the venture of the decedent was justified by the circumstances."

Also see Bernardine v. City of New York, 268 App.Div. 444, 51 N.Y.S.2d 888.

The general nature of the alley in question and the extent of its use are highly significant factors affecting our decision as to whether the jury could reasonably find that decedent acted in the interest of human beings, and whether, if the jury so found, it was also their province to determine the issue of contributory negligence. The alley is located in the very center of the business district, is four blocks long and is surfaced with asphalt and gravel. The evidence shows that it had the attributes of a reasonably well travelled street and was regularly used as a public way. According to one witness, "there was considerable traffic for an alley". Another witness testified that the vehicular and pedestrian traffic in the alley was "heavy". Most of the taxicabs came down the alley in order. to "circle" back to their stand. The garage entrance to a taxi stand is located on the alley; also a taxicab gasoline pump which services all the company's taxis. Merchandise trucks regularly load and unload in the alley at the back of the stores. "A lot of people" travel the alley regularly to get to a private parking lot. School children from an adjacent area used the alley in going and coming from school. Certain population groups used the alley more than the streets. There is also testimony that "lots of kids" rode bicycles and walked through the alley, and that there are "vehicles coming and going all the time". Under the evidence, we rule the contention against defendants.

Defendants' final point is that the court erred in refusing their joint and separate motions for a directed verdict because "plaintiff failed to make a case for the jury against either of these defendants under the humanitarian doctrine". Inasmuch as we have held that plaintiff made a submissible case on primary negligence, the instant contention is of no significance. This, because of the settled rule that if plaintiff made a case under any theory submitted, defendants' motion for a direct-ed verdict was properly denied. Nelson v. Wabash Railroad Co., Mo.Sup., 300 S.W. 2d 407, 409.

The judgment is affirmed.

All concur, including HIGGINS, Special Judge.