BACON v. PAYNE.

1. MASTER AND SERVANT—FEDERAL EMPLOYERS' LIABILITY ACT—
RAILROADS—NEGLIGENCE—COMPARATIVE NEGLIGENCE.

Under the Federal employers' liability act (35 U. S. Stat.
chap. 149), the liability of a railroad company for the
death of an employee caused by the negligence of any of
its officers, agents, or employees, is not barred by the con-
tributory negligence of the employee, but the damages are
to be diminished by the jury in proportion to the com-
parative degree of negligence attributable to each; and
there can be no recovery unless the railroad company,
through its employees or otherwise, is guilty of some
causative negligence contributing to or causing the in-
jury.

2. SAME — NEGLIGENCE — CONTRIBUTORY NEGLIGENCE—EXONERATION
BY ATTEMPT TO SAVE OTHERS.

Where a section foreman, noticing one of his men open
a trailing switch when a train was approaching under
the erroneous impression that he was closing it, in his
haste to correct the error ran down the track so close
to the rail that he was struck by the projecting beam of
the engine pilot and so severely injured that his death
resulted, he was not exonerated from contributory negli-
gence on the theory that he risked his life to save other
lives and property, since his conduct was rash and reck-
less, and, from his familiarity with switches, had pre-
sumptive knowledge that no serious results would follow
the train's running through the trailing switch.

3. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—RASH AND RECKLESS
CONDUCT IN EMERGENCY.

The rule of exoneration from negligence where the in-
jured party acted in an emergency does not apply if his
conduct is rash and reckless.

4. MASTER AND SERVANT—RAILROADS—WITNESSES—OPINIONS—EX-
PERT TESTIMONY—INFERENCES ON INFERENCES.

The opinions of section men, who testified to no ex-

On constitutionality, application and effect of Federal em-
ployers' liability act, generally, see notes in 47 L. R. A. (N. S.)
38; 48 L. R. A. (N. S.) 987; L. R. A. 1915C, 47.

perience qualifying them as experts, that there was reason to apprehend that the train would be derailed and wrecked, endangering the lives of its passengers and crew, if it ran through the trailing switch, which were merely inferences based on inferences, should not prevail against the testimony of men with long years of experience in operating trains in various capacities and who had on various occasions run through trailing switches, or seen others do so, that they never knew of rolling stock being derailed or injured on such occasions.

5. SAME—NEGLIGENCE—PROXIMATE CAUSE.
Where plaintiff's decedent was in a place of safety when the switch was thrown, and his own subsequent reckless conduct in negligently placing himself too close to the track in front of the approaching train was the proximate cause of the accident, there could be no recovery.

Error to Arenac; Smith (Guy E.), J.   Submitted May 3, 1922.   (Docket No. 62.)   Decided December 5, 1922.

Case by Herbert W. Bacon, administrator of the estate of Charles W. Oliver, deceased, against John Barton Payne, director general of railroads, for the alleged negligent killing of plaintiff's decedent.   Judgment for plaintiff.   Defendant brings error.   Reversed, and no new trial ordered.

*John C. Hewitt* and *Walter S. Wixson,* for appellant.

*S. E. Hayes, Edw. Gaudern,* and *C. A. Thatcher,* for appellee.

STEERE, J.   Charles W. Oliver, deceased, was a section foreman on the Mackinaw division of the Michigan Central Railroad Company, living at Alger in Arenac county.   Quinn's siding is located about 5½ miles south of Alger and was in his section.   There was a siding or passing track at Quinn nearly a half mile in length paralleling the main track on its west side with a so-called split switch connection at each end.

The main track runs practically north and south past the siding and curves easterly about two pole lengths or 360 feet north of the north end of the siding.

On the morning of March 10, 1919, Oliver went with his section crew of four men on their hand-car to Quinn's siding and commenced work there about 8 o'clock clearing away ice and snow from around the switch and its appliances at the south end of the siding, leaving their hand-car on the main track close to and just beyond the south "switch points," or movable rails at the end of the switch, sometimes also called "wing rails." This split switch at the south end of the siding on the west side of the main track is described as having an easterly switch point rail for about 8 feet from its north end and from there gradually planed off on its east side towards its south end to a thin, sharp, or blade, point making it fit close along the "stock," or main track rail, when moved against it. The westerly switch point is of the "same size and condition," except it is planed down on its west side instead of east. These switch points are fastened together with connecting rods and also connected with the switch stand located on the east or opposite side of the main track from or to which they are moved for switching by an "L"-shaped fulcrum at the bottom of the stand called the "crank" operated by convenient mechanism. Moving the switch points to and from the main track rail by this mechanism is called opening and closing the switch. When the south switch is "open," or "thrown for the side-track" to take trains from the south on to the siding, the east switch point is against the main track rail and the west switch point remains as an open or "idle" point. Such conditions create what is called a "trailing switch" for a train going south on the main track. When the switch is "closed" the main track is free of the switch point and clear or

"normal" for through use.   When open a red signal appears above the switch stand, and when closed a green one.

Soon after Oliver and his crew commenced work the early south-bound passenger train from Mackinaw City, which was over 6 hours late, approached Quinn's siding at a speed of about 60 miles an hour, and they noticed its approach before it came around the curve beyond the north end of the siding.   Oliver was then working with one of his men named Commandie clearing the south switch points and the three other men of his crew, named Marks, Almus and D'Oer, were working about two pole lengths further north near the derailer on the siding, which is connected with and operated from the switch stand.   One of them called to Oliver that the train was coming, to which he replied, "Yes, I know it," telling Commandie to help him push the hand-car into the clear on the siding, which they did, leaving the switch closed, and about the same time Marks started from his work towards the switch, crossing the main track and running down its east side to the switch stand, and threw the switch open.   Seeing this, Oliver started to run in that direction down the west side and close to the main track throwing his arms and calling to Marks that the switch was all right, when he was struck on the left side of his back, or shoulder, by the front beam of the engine pilot of the passing train, throwing him to the right clear of the train, but injuring him so severely that he soon thereafter died.   One of the section hands estimated the approaching train was from 175 to 200 feet away from the switch stand when Marks threw it open.   The engineer of the train testified that he saw the switch signal changed to "open" when he was between 300 and 400 feet from the switch stand and he at once shut off steam and applied the emergency brake; that about the same

time he saw a man start to run down the west side of the track ahead of the train too close to clear the engine pilot beam which struck him when within 40 or 50 feet from the point of the switch. The train ran through the trailing switch without being injured by it, and was brought to a stop on the track some two train lengths or more to the south of it. The only effect of the train running through the switch was to break the west point or "idle" and spring or bend over the easterly switch point.

Plaintiff brought this action to recover for Oliver's death, charging that it was caused by negligence of the railroad company. Upon trial in the circuit court of Arenac county, he recovered a verdict and judgment for $10,000. Defendant brings the case here freighted with 50 assignments of error saved for review by timely objections, motions, requests and exceptions. Many of these assignments are of scant merit and call for no consideration.

The only elements of negligence in the transaction of which there is a suggestion of proof are the conduct of Marks in throwing an open trailing switch in front of a closely approaching train and of Oliver getting in its way as it passed. Though various acts of negligence are charged in plaintiff's declaration, the only imputation of breach of duty which could be seriously urged against defendant was:

"Having in his employ a man who was not competent to tell whether a switch was open or closed, and who did negligently open said switch when defendant's fast train was approaching and about to pass same."

It appears undisputed that at the time of Oliver's death the Michigan Central Railroad Company was engaged in interstate commerce over the line upon which he was employed, and the rights of the parties to this action are governed by the Federal act of

congress passed in 1908, as amended, relating to lia-
bility of common carriers engaged in interstate com-
merce by railroads to their employees (35 U. S. Stat.
chap. 149), which counsel for plaintiff point out
provides in section 1 that defendant is liable if death
occurs "from the negligence of any of the officers,
agents, or employees of such carrier," etc.,—and in
section 3 "the fact that the employee may have been
guilty of contributory negligence shall not bar a re-
covery," but the damages shall be diminished by the
jury proportionate to the comparative degree of neg-
ligence attributable to each.    If, however, a railroad
company, through its employees or otherwise, is guilty
of no causative negligence contributing to or causing
the injury, which is shown to have befallen the in-
jured employee through his own negligence or other
causes not imputable to the negligence of either, there
can be no recovery.

In an effort to absolve deceased from his apparent
negligence, counsel impute to him unselfish sacrificial
motives which inspired him to risk and lose his life
in an effort to preserve that of the passengers on the
train and save his employer's property, citing certain
decisions in which it has been held that, where one
acting in a sudden emergency has attempted to save
life or his employer's property, he may be regarded
free from contributory negligence under special cir-
cumstances, although his conduct might under other
circumstances defeat recovery because he was neg-
ligent.    The circumstances in those cases bear little
analogy to those shown here.    To make them more in
point counsel sought to show that deceased had reason
to apprehend running through the trailing switch
portended derailing and wrecking the on-coming pas-
senger train, endangering the lives of its passengers
and crew.    For that purpose plaintiff called as wit-
nesses certain section hands who were allowed as ex-

perts to testify to the probability or possibility of a train being derailed in running through a trailing switch. None of those witnesses, three of whom were members of Oliver's crew, had ever in their experience seen a train, engine or car derailed or injured from running through a trailing switch. The questions propounded to and answered by them were hypothetical, based on suppositions and answered inferentially to the effect that if the switch points did not break or spring the train might be derailed, and if derailed wrecked, and if wrecked life and property destroyed, their ultimate opinions as to the probability of disastrous results being inferences based on inferences which were contrary to any shown facts in the case. These witnesses testified to no experience qualifying them as experts on that subject, while the testimony of men with long years of experience in operating trains in various capacities and who had on various occasions run through trailing switches, or seen others do so, testified that they never knew of rolling stock being derailed or injured on such occasions, though it might injure the switch by breaking off the switch points or bending the crank at the bottom of the switch stand, and engineers were forbidden under a penalty from doing so if it were possible to avoid it. The engineer of the train which passed safely through the trailing switch that day testified that he had been a locomotive engineer 28 years, that he had never known of a train being derailed or any one being hurt in running through a trailing switch, had done it himself "lots of times," but never did so if he could help it as he was likely to be penalized for the damage it might do to the company's property. Others with years of experience as engineers, roadmasters, train masters, etc., and who had seen many trailing switches run through by themselves and others gave undisputed testimony to the

same effect. Oliver had worked for this railroad company since 1916 and for other railroads before that time in employment requiring him to care for switches and become familiar with their use. He knew they were required to be kept closed when not in use and, presumptively, had some knowledge of the effect of trains running through trailing switches. He knew the switch should be closed when trains passed, and, on discovering what Marks had done, impulsively ran in that direction in a hopeless effort to correct it before the train passed. He ran by the side of the track, not upon it, and in his haste, negligently ran too close to the rail to avoid the over-hang of the engine. The attending circumstances do not justify the claimed conclusion that he heroically rushed into danger "to snatch from it the life of a fellow creature imperiled by the negligence of another."

The trial court instructed the jury:

"And if you find from the evidence that such emergency did arise, and that said Charles Oliver in good faith attempted to have the switch closed and thus avoid damage to the defendant's property, and that he was justified in so doing, you should not find him guilty of contributory negligence."

The rule of exoneration from negligence where the injured party acted in an emergency does not apply if his conduct is rash and reckless. That by carelessly keeping too close to the track in his haste Oliver voluntarily and recklessly exposed himself to an extreme risk, which plaintiff claims was caused by another's negligence, is evident. In *Cook* v. *Johnston,* 58 Mich. 437 (55 Am. Rep. 703), where the risk was taken to save property, the court held in substance (quoting from the syllabus) that:

"One who voluntarily exposes himself to evident risks caused by another's negligence cannot recover against the latter for bodily injuries resulting from

such exposure even though the exposure was for the purpose of saving property or the life of an animal."

In its final analysis, however, we conclude that the controlling question in this case is whether, under the evidence, any negligence of defendant is shown which as a matter of law was a proximate cause of the injury complained of. The wrongful act complained of was Marks' throwing open a trailing switch before an approaching train.

"The damages to be recovered in an action must always be the natural and proximate consequences of the wrongful act complained of. If a new force or power has intervened, of itself sufficient to stand as the cause of the mischief or injury, the first must be considered as too remote." *Borck* v. *Nut Works*, 111 Mich. 129.

"To make such negligence the proximate cause of an injury, it must be the natural and probable consequence of the negligent act, which, under the circumstances, an ordinarily prudent person ought reasonably to have foreseen might probably occur as the result of his negligent act." *Baker* v. *Railroad Co.*, 169 Mich. 609.

*Vide*, also, *Stoll* v. *Laubengayer*, 174 Mich. 701; *Sabela* v. *Mining Co.*, 184 Mich. 676.

That Marks, like Oliver, was actuated in what he did by an honest effort to put the switch safe is indicated by the fact that Oliver with Commandie's help had just pushed their hand-car through the open switch onto the siding from the main track and Almus heard Marks exclaim just as he jumped across the track to run down to the switch, "I wonder if that switch is all right." But his blunder could not in itself cause or contribute to the injury complained of, which would not have occurred unless for Oliver's reckless act in assuming the exposure.

Conceding Marks' negligence to the full and defendant's responsibility for its consequences, his act in no

sense imperiled Oliver, who was then in a place of unquestioned safety from the closely approaching train. His own subsequent reckless conduct in negligently placing himself too close to the track in front of the swiftly approaching train was the sole and proximate cause of the accident, not Marks' throwing the switch. Without his independent intervening human agency no harm could have befallen him from what Marks did. No precedent or concurrent causative act of defendant placed him in jeopardy.

Judgment must therefore be reversed without a new trial.

FELLOWS, C. J., and WIEST, MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.