Roy H. BEHM, Respondent,

v.

KING LOUIE'S BOWL, INC., Appellant.

No. 23174.

Kansas City Court of Appeals.

Missouri.

June 5, 1961.

Richard P. Sprinkle, Sprinkle, Carter, Sprinkle & Larson, Kansas City, for appellant.

Allan R. Browne, Ennis, Browne & Martin, K. L. Stockman, Kansas City, for respondent.

SPERRY, Commissioner.

Plaintiff, Roy Behm, sued defendant, King Louie's Bowl, Inc., for damages growing out of injuries to person and property allegedly caused by defendant's interference with the natural drainage of surface water, diverting it and causing it to flow in a torrent into plaintiff's basement garage and shop. From an adverse judgment of $7,500, defendant appeals.

Defendant owns a large building in which is housed a bowling alley. There is a parking lot to the north and west. It is located on the west side of Troost and on the south side of 79th street, in Kansas City. Plaintiff operated an automobile repair shop located in the basement of Mock's service station, situated on the west side of Troost and on the north side of 79th St. Terrace. The Bowl building sets 50 feet north of the Mock building, and, between, there is a vacant lot. Plaintiff's building is reached by turning north from 79th Terrace onto his back lot, thence east into the building. There is a dike on the north side of the lot. A few feet west of plaintiff's back lot, but several feet lower,

there is a gully with a drain that passes under 79th Terrace. Its function is to permit the drainage of surface water coming from Troost, to the east, from the north as far as 79th street, and from the west about half a block. About halfway between Troost and Campbell, a block west of Troost, on 79th, there is a low place in the terrain and that low point continues south and east, across the parking lot, to the drain. There was testimony to the effect that it is from 3 to 6 inches lower at the lowest point in the lot than it is near the southwest corner of the building. The terrain in this area slopes from the north, east, and west, toward the drain, but it is some higher west of the low point than it is to the east of it up to the west edge of the Bowl building. It continues to slope to the south for about another block.

At the time the damages occurred, defendant maintained a board fence extending from the northeastern corner of its parking lot to the west limits thereof, thence to the southwestern corner, thence east to a point some 15 feet west of the southwest corner of its building. The entire parking area had been evenly graded, sloped and blacktopped: a row of railroad ties, laid end to end, were around the area, about a foot or two inside the fence; and another row, also end to end, extended from a point about 5 feet north and 35 or 40 feet west of the northwest corner of the building northward a distance of some 70 to 75 feet. There was testimony to the effect that the ties were 12 inches thick and 12 inches wide. They were not fastened together at the time the flood occurred but, afterwards, they were laid end to end with 15 inch intervals and a 2x4 was spiked to the ties on either side of the interval. The lower edge of the lowest boards of the fence were from 12 to 15 inches above the surface of the ground.

Witness Larry Miller had lived about a block west of Troost on 79th Terrace since he was a small child. He had played in this area before the Bowl improvements were built. He stated that he had witnessed heavy rains on the Bowl lot after it was built but before the ties were placed and that the water flowed evenly and without stoppage, smoothly, to the south.

On his way home from school on May 16, 1957, shortly after 3 P.M., he drove to 79th & Troost, thence west to Campbell, and to his home. He stated that it was raining hard but the flow of water on the parking lot was not heavy; that, after he arrived home, he walked down to plaintiff's place and the water was coming down across the parking lot and into the gully leading to the drain, "But afterwards it started raining harder and the water sort of diverted itself from its original path into the culvert and half of it was going in there and half of it was going into Mr. Behm's shop." He stated that the water from the east side of the lot flowed towards the west until it hit the row of ties, which funnelled it down to the fence where there was another row of ties, "which funnelled it right down towards Mr. Behm's shop"; that the water being funnelled to Behm's flowed through the space between the end of the fence and the corner of the building; that it was a strong flowing stream; that witness removed a car from the shop and placed it in Mock's building upstairs; that plaintiff then started to drive a truck outside but was met at the door by a "gush" of water carrying five or six railroad ties; that the truck was pushed backward, to the east side of the shop; that plaintiff untied his pet wolf in the back of the shop and started towards the door; that witness was in the middle of the shop at that time and started outside; that the water was up to his waist; that plaintiff was leading his pet wolf out; that witness got out and when he next looked he saw a flash and plaintiff was not within sight; that when he again looked inside, plaintiff was just inside, to the south of the door, and witness helped him out; that the water was from five to six feet deep; that, after the water subsided, there remained mud, rocks, and railroad ties, and that the air compressor, which had been right south of the door was broken loose from its mountings and was in the debris.

Mr. Behm stated that, on the occasion of the flood, he was working in his garage and it was raining heavily; that Mr. Miller and Mr. Abbot were there; that Abbot was helping him; that a customer came for a car that was finished and took it out; that there was another car behind it with a door off and he asked Miller to take it out and put it upstairs; that Miller then went up toward the Bowl and someone shouted: "The water is backing up!"; that plaintiff put on his coat and walked up to the corner of the Bowl; that he saw the water backed up from the ties; that the ones in the center started floating down and piled up on the ones against the south fence; that the water was flowing in a strong current between the building and the fence and towards his garage; that when he saw the water coming fast he started back to get out his tow-truck "because I didn't know what might happen"; that someone shouted: "King Louie is flooded, it is in the basement"; that Miller came around there and said; "There is some water coming around here, got some railroad ties"; that when he got the tow-truck up (to the door) there was a wall of water, three or four feet deep, with ties, that came swooping in there; that it forced the truck backwards to the east wall; that he unchained his pet wolf and started out of the basement; that the air compressor was right beside the door and, fearing it might explode, he reached to turn off the switch; that at that time a pipe on the compressor broke, permitting the pressure to go down; that the electricity automatically started the motor; that there was a blinding flash and "I went under"; that, when he again was conscious, he was being assisted out of the basement by Miller.

He stated that, after the water subsided, several truck loads of mud and debris, including rocks, ties, and bowling pins, were hauled out; and that the pins were washed out of the basement of the Bowl building.

The testimony of the two eyewitnesses mentioned, if believed by the jury, will support a finding to the effect that the flooding of plaintiff's place of business was caused by defendant's placement and maintenance of ties as described in evidence. These witnesses were present and saw what happened. They told the jury what they saw. They said that the water came down the slope from the east, struck the north-south line of ties, was funnelled to the south where it struck the east-west line; that the water backed up behind the fence and rushed in a torrent between the corner of the Bowl and the east end of the fence, pouring into and filling defendant's basement; that the water east of the center line of ties was diverted in its southward flow on the lower part of the lot and funnelled through the gap between the fence and the Bowl, in a flood, carrying ties and bowling pins, passing over and through the dike protecting the north side of plaintiff's lot, and into his building.

The testimony is not contrary to the physical facts when the testimony concerning the nature of the terrain and the effect that the placement of the ties thereon may have had is considered. The surface of the lot east of the north-south line of ties sloped from north to south and from east to west, and the elevation at the east end of the fence, near the southwest corner of the Bowl, was from 3 to 6 inches higher than that at the low point where the line of ties was located. There was testimony to the effect that the ties were 12 inches thick. There were no spaces between them to permit the passage of water. These conditions could have caused the water to overflow from the basin, at the point where the witnesses said it did; and if ties floated from the north and piled up against the south fence, the flood condition may have been aggravated.

█ It is settled law that surface water is a common enemy which every man may ward off his land and throw on a lower owner, providing he does not collect it and discharge it to another's damage. Polich v. Hermann, Mo.App., 219 S.W.2d 849, 854. "Nor may the upper owner discharge water in a different manner than it would usually and ordinarily have done in the natural

course of drainage." Polich v. Hermann, supra, 219 S.W.2d 855.

Here, water diversion was not the moving cause for the placement of the ties; but that is of no moment if defendant could reasonably have anticipated that the natural flowage of water would be restrained, collected and deflected to plaintiff's damage. Corrington v. Kalicak, Mo. App., 319 S.W.2d 888, 894.

"An injury that is the natural and probable consequence of an act of negligence is actionable, and such an act is the proximate cause of the injury. But an injury which could not have been foreseen nor reasonably anticipated as the probable result of an act of negligence is not actionable, and such an act is either the remote cause, or no cause whatever, of the injury. An injury that results from an act of negligence, but that could not have been foreseen or reasonably anticipated as its probable consequence, or that would not have resulted from it had not the interposition of some new and independent cause interrupted the natural sequence of events, turned aside their course, and produced it, is not actionable. Such an act of negligence is the remote, and the independent intervening cause is the proximate, cause of the injury. A natural consequence of an act is the consequence which ordinarily follows it— the result which may be reasonably anticipated from it." Brubaker v. Kansas City Electric Company, 130 Mo.App. 439, 110 S.W. 12, 14.

■ Is is common knowledge that the area in which Kansas City is situated is subject to terrific downpours of rain at various times. While such excessive rains do not occur with regularity, they do occur with reasonable frequency. The disastrous floods of 1951 are of common knowledge to the people of this area.

■ Defendant had the right to improve its lot for parking purposes, grade, smooth and pave it, which improvement would accelerate the drainage of water coming onto the area. It should have anticipated that 12 inch ties, laid end to end with no interval between, would interfere with the free flowage of surface water. The lot was graded and paved in order to eliminate the muddy conditions, and quickly drain excessive water. Defendant should have anticipated, considering the lay of the land and the directions of natural drainage, that water would not be drained from the lot along the lines of natural flowage, because of the placement of the ties and of their size, but would be diverted and caused to flow in a different channel in a damaging flood, onto plaintiff's lower property. · The jury could have found defendant guilty of actionable negligence and liable to plaintiff for damage to his property for having caused it to be flooded in the manner that it was.

■ Plaintiff sought and recovered for damages to his property *and to his person* in one count and one submission. Defendant contends that plaintiff may not recover for his personal injuries under the evidence here; that he saw the water coming around the corner of the Bowl, between it and the fence, and heading for his building (Plaintiff so testified); that he was then standing near the corner of the building, in a position of safety; and that defendant is not liable for damages that could not have been incurred had plaintiff not voluntarily entered the garage to salvage his personal property.

Plaintiff stated that he walked up to the corner of the building and saw some ties floating and saw the water, in quantity, coming around the corner of the building and heading towards his garage; that he left and went to get his truck out of the basement because he didn't know what might happen. He also knew that there were electrical appliances in the garage

which might become dangerous if the place was flooded. His testimony was to the effect that when the front of the truck reached the door it was met by a wall of water three or more feet in height, carrying ties and debris. At that time, and from thence forward, he was in peril.

Had he not voluntarily entered the garage he would have been in no danger of suffering an electric shock coming from the air compressor, which was the cause of the injuries he received.

In Eversole v. Wabash R. R. Co., 249 Mo. 523, 541, 155 S.W. 419, 425, the court, in quoting from Donahoe v. Wabash, St. Louis and Pacific Railway Co., 83 Mo. 560, 563, said:

"'A person voluntarily placing himself, for the protection of property merely, in a position of danger is negligent so as to preclude his recovery from an injury so received. It is otherwise, however, when such an exposure is for the purpose of saving human life, and it is for the jury to say, in such cases, whether the conduct of the party injured is to be deemed rash and reckless.' In the body of the opinion ([Eckert v. Long Island Railroad Co.] 43 N.Y. [502], 506, 3 Am. Rep. 721), it is said: 'The law has so high a regard for human life that it will not impute negligence to an effort to preserve it, unless made under such circumstances as to constitute rashness in the judgment of prudent persons. For a person engaged in his ordinary affairs, or in the mere protection of property, knowingly and voluntarily to place himself in a position where he is liable to receive a serious injury is negligence which will preclude a recovery for an injury so received * * *.'"

That doctrine has been many times reaffirmed by the courts of this state and the following quote from Bacon v. Payne, 220

Mich. 672, 190 N.W. 716, appears in Johnson v. Terminal R. R. Ass'n of St. Louis, in Banc, 320 Mo. 884, 8 S.W.2d 891, 893:

"Conceding Marks' negligence to the full and defendant's responsibility for its consequences, his act in no sense imperiled Oliver, who was then in a place of unquestioned safety from the closely approaching train. His own subsequent reckless conduct in negligently placing himself too close to the track in front of the swiftly approaching train was the sole and proximate cause of the accident, not Marks throwing the switch. Without his independent intervening human agency no harm could have befallen him from what Marks did. No precedent or concurrent causative act of defendant placed him in jeopardy."

According to the testimony of plaintiff himself he was in a position of safety, some 50 feet removed from his basement garage when he saw the dammed up water break through at the end of the fence in a torrent and head towards his place of business. He realized the danger to his truck and went to move it out of the garage. As a result of entering his garage immediately ahead of the crest of the flood, he was injured by electricity when the air compressor floated up causing a pipe to break. As a result, the electric motor was automatically activated and plaintiff was electrically shocked and injured.

"'For a person engaged in his ordinary affairs, or in the mere protection of property, knowingly and voluntarily to place himself in a position where he is liable to receive a serious injury, is negligence, which will preclude a recovery for an injury so received; but when the exposure is for the purpose of saving life, it is not wrongful, and therefore not negligent unless such as to be regarded either rash or reckless.'" Hill v. East St. Louis Cotton Oil Co., 202 Mo.App. 478, 214 S. W. 419, 421.

Defendant also complains of error in the admission of evidence regarding a rain in Sept. 1957, and of a U.S. weather report, which tended to show that, four months after the occurrence here, after the ties had been differently placed on defendant's lot, a much heavier rain, falling in Kansas City, failed to cause any flooding on the lot or in the defendant's garage. Similar evidence has long been accepted in similar cases and, subject to cross-examination and other evidence tending to explain it, may be considered by the jury for whatever it is worth. Experimental evidence is admissible if general conditions were the same or similar or substantially similar; differences in conditions are for the jury to consider and evaluate. Faught v. Washam, Mo., 329 S.W.2d 588, 598. The evidence objected to is of the nature of experimental evidence.

Defendant criticises instruction No. 1 but, on the whole, the instruction fairly states the issues. Upon retrial any correction necessary may be made.

The judgment is reversed and the cause is remanded for a new trial on the issue of damages alone.

MAUGHMER, C., concurs.

PER CURIAM.

The foregoing opinion of SPERRY, C., is adopted as the opinion of the court.

All concur.